[No. B019329. Second Dist., Div. Six. Nov. 24, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
KEVIN GENE GRAY, Defendant and Appellant.

**COUNSEL**

Clifford Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Donald J. Oeser and Robert N. Kwong, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STONE, P. J.**—Kevin Gene Gray appeals from a jury conviction of two counts of lewd and lascivious conduct upon a child under 14 years of age (Pen. Code, § 288, subd. (a)) and resultant sentence of 5 years on probation, 135 days in county jail, and $800 in fines—$100 to the State Restitution Fund, $200 in restitution fines, and a statutory fine of $500. He contends the trial court committed reversible error in ruling admissible the prosecution's expert testimony on child sexual abuse accommodation syndrome and that the case must be remanded for resentencing because the trial court did not adequately state its reasons for imposing $700 of the fine. We find neither reversible error nor necessity for remand, and affirm the judgment.

FACTS

*The Prosecution's Case.*

Nine-year-old Tosha M., appellant's stepdaughter, testified that one morning, while watching television together on the bed, appellant rubbed her underpants in the vaginal area while rubbing her back. On another occasion in the bedroom, appellant placed her hand on his penis. He also touched her shirt below the navel while explaining the facts of life to her. She did not reveal these incidents—which occurred between January and June 1985—until the summer of 1985 when she spent the summer with her father, Mr. M, and stepmother, Mrs. M. That summer she told Mrs. M. about two of the incidents. However, the only person to whom she related the penis-touching incident was Detective English, in response to his questions.

Doctor Mosman, a child psychologist, testified about child sexual abuse accommodation syndrome. He said it is not a diagnosis or a test, but rather an attempt to identify traits and characteristics of child sexual abuse. He did not render a diagnosis or testify on the ultimate issue—whether Tosha had been molested—but confined his opinion to experiences and behavioral traits common to child abuse victims.

*The Defense Case.*

Tosha's father admitted that he always disliked appellant. Her mother said she told Mr. M. that she intended to sue for overdue support payments. He telephoned her in July 1985 to inform her of Tosha's accusations against appellant and said he would not pursue the matter if she left appellant. When she refused, he reported Tosha's complaints to the child custody mediator who called the police.

Tosha said her father became angry and yelled at her when she attempted to tell him about "good touches" or "bad touches" and she would agree with him to calm him. She told her mother that she may have been wrong about some of the things she said. He kept pictures of naked women, including his wife, Kathy, in the house.

Tosha's mother testified that Tosha had a good relationship with appellant. At no time during the period of the alleged touchings did Tosha ever have sleeping, eating or school problems or behavioral changes toward appellant. She said that she and appellant explained the facts of life to Tosha one day because of an incident Tosha witnessed at school that triggered questions about "the birds and the bees." Appellant pointed his finger below Tosha's navel during the explanation but did not touch her.

Doctor Oliver, defense expert, testified that child sexual abuse accommodation syndrome is not a generally accepted syndrome but acknowledged that delayed reporting is not unusual in child molestation cases.

Appellant testified that he occasionally rubbed Tosha's back, legs and chest out of affection but denied any sexual interest in her and denied touching her vaginal area.

## DISCUSSION

I. *Trial Court Did Not Commit Reversible Error in Allowing Doctor Mosman's Testimony.*

When the prosecutor indicated he would call Doctor Mosman to testify about child sexual abuse accommodation syndrome (the syndrome), appellant moved to exclude the testimony. In an Evidence Code section 402 hearing out of the jury's presence, appellant objected that the syndrome is not widely or generally accepted within the psychological community and thus does not satisfy the standards set forth in *Frye* v. *United States* (D.C.Cir. 1923) 293 F. 1013 and *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]. Appellant also claimed the rule of *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291] precluded this "highly prejudicial" testimony.

The trial court, relying on this court's opinion in *People* v. *Payan* (Nov. 5, 1985) B007167, subsequently ordered unpublished by the Supreme Court January 30, 1986, ruled that where evidence is not admitted for purposes of establishing a diagnosis or rendering an opinion, the *Kelly-Frye* tests do not apply. Doctor Mosman said his opinion would be confined to common experiences of child molest victims, matters with which the public is not familiar. He said that the syndrome, described by Doctor Roland Summit, was not a diagnosis, but a description of traits and characteristics, specifically, secrecy, helplessness, entrapment and accommodation, delayed reporting and inconsistency, and retraction.

*People* v. *Bledsoe, supra,* held that expert testimony that a complaining witness suffers from rape trauma syndrome is not admissible to prove that a witness was raped. (36 Cal.3d 236, 251.) The Supreme Court held that admissibility of expert testimony on a given subject must turn both on the nature of the particular evidence and its relation to a question actually at issue in the case. (P. 246.) Although in a rape prosecution case, expert testimony on the aftereffects of rape may be admitted for a variety of purposes, the evidence in *Bledsoe* was not admissible for the purpose for which it was offered—namely, to prove that a rape occurred. (*Id.,* at p. 238.)

■ Here, Doctor Mosman's testimony was not admitted "as a means of proving—from the alleged victim's post-incident trauma—that a [molestation] had, in fact, occurred." (*Id.*, at p. 248.) It was admitted after Tosha testified she did not tell anyone about touching appellant's penis except in response to Detective English's questioning, she did not tell anyone until she testified in court that appellant said, at the time, "it won't bite you," and she told her mother she might have been incorrect about some incidents but agreed with her father because she feared his anger. Doctor Mosman said that delayed reporting and inconsistency is not unusual with victims of child molestation, a statement concurred in by the defense expert, and explained what causes children to react differently to molestation than adults might expect.

"Where the expert refers to specific events, people, and personalities and bases his opinion as to credibility on his diagnosis of *this* witness, then the conclusion that the witness is credible rests upon the premise that the diagnosis is accurate, and that in fact molestation had occurred. The jury in effect is being asked to believe the diagnosis, to agree that the doctor's analysis is correct and that the defendant is guilty. Such a result would subvert the sound rule adopted by a unanimous Supreme Court in *Bledsoe*. It follows, therefore, that the expert testimony authorized by *Bledsoe* to permit rehabilitation of a complainant's credibility is limited to discussion of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and does not extend to discussion and diagnosis of the witness in the case at hand." (*People* v. *Roscoe* (1985) 168 Cal.App.3d 1093, 1099-1100 [215 Cal.Rptr. 45], fns. omitted.) Here, the expert did just that. He did not make a diagnosis of molestation nor did he rely "on a detailed analysis of the facts in the case at hand." (*Id.*, at p. 1100.)

Through cross-examination of Tosha and other witnesses, appellant suggested that the delay in reporting the alleged molestation and failure to disclose all incidents when she finally told her stepmother was inconsistent with her claim of molestation. *Bledsoe* acknowledged that, to rebut such evidence, "expert testimony . . . may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (36 Cal.3d 236, 247-248.) Similarly here, explanation of the difference between child and adult behavior when faced with the alleged incidents was useful.

■ Additionally, we disagree with appellant's contention that the trial court erred in failing to apply the *Kelly-Frye* test. *Kelly-Frye* conditions the admissibility of evidence based on new scientific method of proof on a

showing that the technique has been generally accepted as reliable in the scientific community in which it developed. (*People* v. *Shirley* (1982) 31 Cal.3d 18, 34 [181 Cal.Rptr. 243, 641 P.2d 775].) The proponent must establish reliability of method and proper qualifications of the testifying witness. (*People* v. *Roehler* (1985) 167 Cal.App.3d 353, 388 [213 Cal.Rptr. 353].) A single witness is insufficient to represent the views of an entire scientific community regarding reliability of the technique. (*People* v. *Kelly, supra,* 17 Cal.3d 24, 37.) Those techniques are not necessarily limited to manipulation of physical evidence. (*People* v. *Shirley, supra,* at p. 53.) "(W)e do not doubt that if testimony based on a new *scientific* process operating on purely psychological evidence were to be offered in our courts, it would likewise be subjected to the *Frye* standard of admissibility." (*Id.,* at p. 53, italics added.) The purpose of the standard is to prevent the jury from being misled by unproven and ultimately unsound scientific methods. (*Ibid.; People* v. *Kelly, supra,* 17 Cal.3d 24, 31-32.)

Since in *Bledsoe* and cases cited therein discussing the rape trauma syndrome, the diagnosis was used to prove a rape occurred, subjecting rape trauma syndrome to *Frye* parameters makes sense. Here, the evidence was not introduced—and did not purport—to prove molestation had occurred. It was "admissible as bona fide rebuttal, such as . . . testimony based on general literature or experience as to the reluctance of molest victims, as a class, to talk to investigators" (*People* v. *Roscoe, supra,* 168 Cal.App.3d at 1100-1101) or to discuss the intimate details of the incidents.

The evidence at bench is much more akin to expert testimony informing the jury of certain factors that may affect an eyewitness identification. (See *People* v. *McDonald* (1984) 37 Cal.3d 351, 370-371 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) Expert testimony does *not* seek to take over the jurors' task of judging credibility nor does it tell the jury that any particular witness is or is not truthful or accurate. (*Id.,* at p. 370.)

In the context of expert witness testimony affecting accuracy of eyewitness identification, the California Supreme Court was not persuaded that the *Kelly-Frye* rule applied. (*Id.,* at p. 372.) "It is important to distinguish in this regard between expert testimony and scientific evidence. When a witness gives his personal opinion on the stand—even if he qualifies as an expert— the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently 'scientific' mechanism, in- strument, or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and

tentative. . . . [¶] Here, by contrast, no such methods are in issue. We have never applied the *Kelly-Frye* rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association. . . ." (*Id.*, at pp. 372-373.)

Appellant contends that his entire defense theory was that Tosha was being pressured into making these charges by her father because he did not like appellant. He asserts that this theory is supported by Tosha's own testimony that she told her mother she may have been wrong about some of her testimony and that she sometimes agreed with her father to make him stop yelling at her. Thus, he argues, admission of Doctor Mosman's testimony was reversible error because, in explaining that child molestation victims often retract their stories because of fear of causing break-up of the family and unhappiness to parent, he "effectively eliminated" appellant's defense.

■ We disagree. As advocated in *People* v. *Roscoe, supra,* Doctor Mosman spoke about child molestation victims as a class and did not focus upon Tosha. Moreover, the defense expert agreed with Doctor Mosman that it is not unusual for there to be a delay in reporting or for gradual disclosure of increasingly intimate details. Although he disagreed that the syndrome has been proven to encompass the five specific factors Mosman described, he acknowledged there are certain behavioral traits seen in molestation victims, i.e., delayed reporting, increased disclosure, accommodation in the sense of outward affection toward an adult the child also fears, and increased likelihood of immediately reporting a stranger than a family member. ■ "[T]he subject of child molestation and more particularly, the sensitivities of the victims, is knowledge sufficiently beyond common experience such that the opinion of an expert would be of assistance to the trier of fact." (*People* v. *Dunnahoo* (1984) 152 Cal.App.3d 561, 577 [199 Cal.Rptr. 796]; see also *State* v. *Myers* (Minn. 1984) 359 N.W.2d 604; *Smith* v. *State* (1984) 100 Nev. 570 [688 P.2d 326]; *State* v. *Middleton* (1982) 294 Or. 427 [657 P.2d 1215]; *State* v. *Harwood* (1980) 45 Or.App. 931 [609 P.2d 1312]; *Commonwealth* v. *Stago* (1979) 267 Pa.Super. 90 [406 A.2d 533]; *State* v. *Kim* (1982) 64 Hawaii 598 [645 P.2d 1330].) Appellant challenged only the reliability of the method under *Kelly-Frye* and *Bledsoe,* not the qualifications of the witness.

■ Finally, assuming the trial court erred in admitting Doctor Mosman's testimony, we find inclusion of this evidence was not prejudicial. Tosha told her stepmother, the social worker and Detective English about various incidents. Detective English testified, without objection, that in his expe-

rience in investigating sexual abuse cases, it is not unusual for there to be a gradual disclosure of additional information and that when he asked Tosha if at any point appellant had tried to have her touch him, she looked down, would not answer, appeared embarrassed and finally pointed to a man's penis on an anatomical drawing.

Thus, one of the main factors discussed by Mosman and Oliver and the one emphasized in the prosecutor's argument—delayed disclosure—had already been included in evidence before Doctor Mosman even testified. As appellant's counsel pointed out at trial, some of the other factors Doctor Mosman discussed were not particularly pertinent to the facts of this case. We conclude that it is not reasonably probable the jury would have reached a different result without it. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Bledsoe, supra,* 36 Cal.3d at p. 252; *People* v. *Roscoe, supra,* 168 Cal.App.3d at p. 1101.)

II. *Remand For Resentencing Unnecessary.*

Appellant contends remand is required for resentencing because the trial court never stated its authority for imposing $700 in fines or a reason for so doing. ■ As appellant concedes, the appellate court in *People* v. *Romero* (1985) 167 Cal.App.3d 1148 [213 Cal.Rptr. 774] held that superior courts are not required to state formal reasons on the record for imposing restitution fines mandated by Government Code section 13967 and Penal Code section 1202.4. The court is required to provide a statement of reasons for the waiver of any such fine made pursuant to Penal Code section 1202.4. (*Id.,* at p. 1156.) Appellant contends this rule prevents meaningful appellate review.

Government Code section 13967 provides that, "Upon a person being convicted of any crime in the State of California, the court shall, in addition to any other penalty provided or imposed under the law, order the defendant to pay . . . restitution . . . in the form of a penalty assessment in accordance with Section 1464 of the Penal Code. *In addition,* if the person is convicted of one or more felony offenses, the court shall impose a separate and additional restitution fine of not less than one hundred dollars ($100) and not more than ten thousand dollars ($10,000). . . ." The section then delineates relevant factors the court should consider.

Penal Code section 1202.4, subdivision (a) provides, in pertinent part, that "In any case in which a defendant is convicted of a felony, the court shall order the defendant to pay a restitution fine as provided in subdivision (a) of Section 13967 of the Government Code. Such restitution fine shall

be in addition to any other penalty or fine imposed and shall be ordered regardless of the defendant's present ability to pay. . . ."

Penal Code section 1203.1 provides, in pertinent part, that "The court shall consider whether the defendant as a condition of probation shall make restitution to the victim or the Restitution Fund" and also provides that the court "may fine the defendant in a sum not to exceed the maximum fine provided by law in the case; or may in connection with granting probation, impose either imprisonment in county jail, or fine, or both, or neither; shall provide for restitution in proper cases . . . ."

As stated in *People* v. *Romero, supra,* 167 Cal.App.3d 1148, although general provisions which govern statement of reasons under the determinate sentencing law may give imposition of restitution fines the appearance of a sentencing choice, discretion to impose fines within statutory limits has always been a judicial one. (167 Cal.App.3d 1148, 1152-1153.) Moreover, requiring judges to enumerate precise reasons for imposing particular fines would impose unnecessary and unintended additional burdens on the judiciary. (*Id.,* at p. 1154.) The trial court's limited discretion under the statutes is not insulated from review since certain restrictions apply even though there is no legislative mandate that courts state their exact reasons for imposing fines. (*Id.,* at p. 1156.) Excessive fines are prohibited. (*Ibid.*; Cal. Const., art. I, § 17.) The trial judge has to consider factors relevant to the offense and offender. (*Ibid.*)

Penal Code section 1203.1 grants the court broad discretion to prescribe conditions of probation so long as they serve a proper purpose specified in the statute. (*People* v. *Feno* (1984) 154 Cal.App.3d 719, 734 [201 Cal.Rptr. 513].) Restitution may serve the purpose of rehabilitation of the criminal. (*Ibid.*; *People* v. *Richards* (1976) 17 Cal.3d 614, 619 [131 Cal.Rptr. 537, 552 P.2d 97].) The amount ordered must be supported by the factual record consistent with appellant's due process rights. (*Feno,* 154 Cal.App.3d at p. 735.) "An abuse of discretion exists only when the court acts arbitrarily, capriciously, displays "'whimsical thinking'" or 'exceeds the bounds of reason, all of the circumstances being considered.'" (*People* v. *Mitchell* (1984) 152 Cal.App.3d 433, 438 [199 Cal.Rptr. 507].)

Here, the sentencing court heard all the testimony, counsels' arguments, and read the probation reports. Although a statement of reasons might facilitate review process (*People* v. *Mitchell, supra,* at p. 438; *People* v. *Romero, supra,* at p. 1157), we believe the holding of *People* v. *Romero* is sound and equally applicable to Penal Code section 1203.1. The trial court is not required to state formal reasons on the record for its choice of restitution

fine. Based on the record before us, we find no abuse of the court's discretion in choosing the amount.

The judgment is affirmed.

Gilbert, J., and Abbe, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 5, 1987. Racanelli, J.,* White, J.,* and Anderson, J.,* participated therein. Mosk, J., and White, J.,* were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.